# United States Court of Appeals

## For the First Circuit

No. 11-1196

NATIONAL ORGANIZATION FOR MARRIAGE, INC.,
and AMERICAN PRINCIPLES IN ACTION, INC.,

Plaintiffs, Appellants,

v.

WALTER F. McKEE, et al.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

Before

Boudin, Selya, and Lipez, Circuit Judges.

James Bopp, Jr., with whom Stephen C. Whiting, The Whiting Law Firm, Randy Elf, Jeffrey A. Gallant, Josiah S. Neeley, and James Madison Center for Free Speech were on brief, for appellants.
Thomas A. Knowlton, Assistant Attorney General, with whom Phyllis Gardiner, Assistant Attorney General, was on brief, for appellees.
Mary L. Bonauto, Catherine R. Connors, and Pierce Atwood LLP on brief for Amicus Gay & Lesbian Advocates & Defenders.

January 31, 2012

**LIPEZ, Circuit Judge**.  This appeal presents the second chapter of a lawsuit challenging the constitutionality of Maine laws imposing registration and disclosure requirements on entities that finance election-related advocacy.  In a recent decision, we rejected claims made by one of the appellants here, the National Organization for Marriage ("NOM"), asserting that Maine's laws regulating political action committees ("PACs") are unconstitutionally vague and overbroad in violation of the First and Fourteenth Amendments.  See NOM v. McKee, 649 F.3d 34 (1st Cir. 2011) ("NOM I").  We now consider similar contentions raised by NOM and co-appellant American Principles in Action, Inc. ("APIA") concerning the law applicable to ballot question committees ("BQCs").  See Me. Rev. Stat. Ann. tit. 21-A, § 1056-B.  Our decision in NOM I effectively disposes of most of appellants' challenges to Maine's BQC requirements.  On the only substantively distinct issue — the constitutionality of the definition of "contribution" in section 1056-B — we conclude that the BQC law, like the PAC laws, is constitutional.  We thus affirm in its entirety the district court's grant of summary judgment for the defendants.

**I.**

**A. The BQC Law: Section 1056-B**

Maine's BQC law, section 1056-B, imposes disclosure and reporting requirements on certain individuals and organizations

-2-

that "receive[] contributions or make[] expenditures," other than through PACs, "for the purpose of initiating or influencing a [ballot-measure] campaign." See Me. Rev. Stat. Ann. tit. 21-A, § 1056-B.[1] Individuals and groups who receive or make aggregate contributions or expenditures in excess of $5,000 for such a purpose are required to file periodic reports with the Commission on Governmental Ethics and Election Practices ("Commission"). Id. §§ 1001(1), 1056-B. They must register with the Commission as a BQC within seven days of reaching the $5,000 threshold, and the information provided on the registration form "must include specification of a treasurer for the committee, any other principal officers and all individuals who are the primary fund-raisers and decision makers for the committee." Id. § 1056-B. The statute requires BQCs to report contributions from, and expenditures to, "a single source aggregating in excess of $100 in any election." Id. § 1056-B(2).

Under section 1056-B(2-A), a contribution is defined to include:

---

[1] The statute was amended in 2010 to substitute the word "campaign" for "ballot question," Me. Pub. Laws 2009, ch. 524, §§ 8-13, and the "purpose of" phrase was streamlined in 2011 by eliminating "promoting" and "defeating" as triggering activities in addition to "initiating" and "influencing," Me. Pub. Laws 2011, ch. 389, § 38. Under Maine law, pending proceedings are not affected by statutory amendments. See Me. Rev. Stat. Ann. tit. 1, § 302. The changes do not in any event affect the outcome of this case, and we follow the district court's lead in using the new language. See Nat'l Org. for Marriage v. McKee, 765 F. Supp. 2d 38, 40 n.3 (D. Me. 2011).

A. Funds that the contributor specified were given in connection with a campaign;

B. Funds provided in response to a solicitation that would lead the contributor to believe that the funds would be used specifically for the purpose of initiating or influencing a campaign;

C. Funds that can reasonably be determined to have been provided by the contributor for the purpose of initiating or influencing a campaign when viewed in the context of the contribution and the recipient's activities regarding a campaign; and

D. Funds or transfers from the general treasury of an organization filing a ballot question report.

Persons or organizations filing reports under section 1056-B must keep detailed records for four years following the election to which the records pertain, including "a detailed account of all contributions made to the filer for the purpose of initiating or influencing a campaign and all expenditures made for those purposes." Id. § 1056-B(4)(A).

## B. Procedural Background

Section 1056-B was the original target of a complaint filed by NOM and APIA in October 2009, shortly before an election in which Maine voters were asked in a ballot question whether a recent law permitting same-sex marriage in Maine should be overturned. NOM is a national nonprofit advocacy organization "dedicated to providing 'organized opposition to same-sex marriage in state legislatures,'" NOM I, 649 F.3d at 48, and it played a

-4-

substantial role in Maine's same-sex marriage referendum campaign, see Nat'l Org. for Marriage v. McKee, 765 F. Supp. 2d 38, 43 (D. Me. 2011).[2]  APIA, also a nonprofit advocacy organization that operates nationwide, is "dedicated to promoting equality of opportunity and ordered liberty."  Second Am. Compl. ("Compl."), ¶ 7.  Their complaint asserted that section 1056-B should be found unconstitutional on multiple grounds: (1) it imposes substantial burdens on political speech and association without adequate justification, (2) it improperly requires entities to register as BQCs without regard to whether their major purpose is the passage or defeat of a ballot measure, (3) its definition of "contribution" is unconstitutionally vague and overbroad, and (4) the $100 reporting threshold is not narrowly tailored to satisfy any compelling government interest.

    After the district court denied the plaintiffs' motion for a temporary restraining order, see Nat'l Org. for Marriage v. McKee, 666 F. Supp. 2d 193 (D. Me. 2009), NOM amended the complaint to add claims targeting the constitutionality of Maine's PAC registration, independent expenditure, and attribution and disclaimer laws, NOM I, 649 F.3d at 44.  Those additional claims, pursued only by NOM, were resolved by the district court in August 2010, and we reviewed its PAC rulings in our decision in NOM I.

_____

    [2] For clarity, we use NOM's full name in citations to the district court decisions in this case, reserving the acronym "NOM" for citations to our own opinion.

Although we describe certain of our NOM I holdings in more detail below, it suffices to say for now that we rejected all of NOM's claims on appeal and upheld the constitutionality of the challenged PAC statutes.[3]

Meanwhile, the parties filed cross-motions for summary judgment on the original claims challenging the BQC law. While the ruling on the PAC claims was pending on appeal, the district court issued a thoughtful decision granting the defendants' motion for summary judgment on the BQC claims and denying the plaintiffs' parallel motion. See Nat'l Org. for Marriage, 765 F. Supp. 2d at 53.[4] It concluded that: (1) the BQC registration and reporting requirements are not unconstitutionally burdensome and are justified by the State's compelling interest in "provid[ing] important information to Maine voters about the interest groups that are attempting to influence the outcome of a ballot question," id. at 46; (2) the "major purpose test" adopted by the Supreme Court in the context of federal regulations is inapplicable in "this quite different area of state regulation of ballot

---

[3] The district court had held unconstitutional a regulation governing the timing of disclosures. That ruling was not appealed. See NOM I, 649 F.3d at 41 n.2.

[4] In its February 2011 opinion on the merits, the district court liberally incorporated the relevant analysis from its earlier decision on the motion for a temporary restraining order. See Nat'l Org. for Marriage, 765 F. Supp. 2d at 40. In quoting its merits decision, we choose not to distinguish between new text and portions reproduced verbatim from the earlier ruling and, hence, do not identify the latter with double quotation marks.

questions," id. at 49; (3) the definition of "contribution" is neither vague nor overbroad, id. at 50-52; and (4) the $100 reporting threshold "is substantially related to Maine's compelling interest in informing voters and narrowly tailored to avoid unnecessary impositions on associational rights," id. at 53.

We decided NOM I in the interim between the district court's February ruling on the BQC provision and the parties' oral argument in this appeal. As we describe in Section II, with the exception of appellants' challenges to the statute's definition of "contribution," our decision in NOM I largely disposes of appellants' contentions concerning the BQC statute. We thus address those issues only briefly before considering appellants' arguments concerning section 1056-B's definition of "contribution."

**II.**

## A. First Amendment Overbreadth Challenge

Appellants argue that, under Supreme Court precedent, Maine may define an entity as a BQC — thus triggering what they characterize as the "onerous" requirements of BQC status — only if the entity is under the control of a candidate for state or local office or has as its "major purpose" the passage or defeat of a ballot measure in Maine.[5] They maintain that section 1056-B is

---

[5] The "major purpose" test has its origins in Buckley v. Valeo, 424 U.S. 1 (1976), where the Supreme Court narrowly read a federal statute defining political committees to encompass only "organizations that are under the control of a candidate or the major purpose of which is the nomination or election of a

unconstitutionally overbroad because it reaches entities outside that "limited zone of permissible regulation." NOM I, 649 F.3d at 58-59.

This thesis, embracing the first two claims addressed by the district court, is essentially the same argument we rejected in NOM I with respect to similar disclosure and reporting requirements for PACs.[6] As an initial matter in NOM I, we discredited NOM's assertion that its constitutional challenge did not arise from the reporting and disclosure requirements per se, but from the statutory definition of a PAC that determines whether a particular entity is subject to the requirements. We noted that "[i]t is not the designation as a PAC but rather the obligations that attend PAC designation that matter for purposes of First Amendment review." Id. at 56. Thus, we rejected "the claim that PAC status is somehow

---

candidate," id. at 79. Appellants have attempted to adapt the test to apply to ballot question committees.

[6] The provisions governing "non-major-purpose" PACs are triggered when an entity receives contributions or makes expenditures of more than $5,000 annually "for the purpose of influencing" a candidate's nomination or election. Me. Rev. Stat. Ann. tit. 21-A, § 1052(5)(A)(5). Upon reaching that threshold, the entity must register with the Commission, maintain records of certain expenditures and donor contributions aggregating more than $50, and file quarterly and other reports. Id. §§ 1053, 1057, 1059-60. These requirements parallel those described above for BQCs. Indeed, the district court noted that "plaintiffs argue that Maine treats ballot question committees essentially like political action committees." Nat'l Org. for Marriage, 765 F. Supp. 2d at 45.

inherently burdensome apart from the specific requirements it entails."  Id. at 58.

Turning to the obligations themselves, we concluded that the "exacting scrutiny" standard applied to our review of the statute, rather than the more rigorous strict scrutiny standard. That is so because the provision "do[es] not prohibit, limit, or impose any onerous burdens on speech, but merely require[s] the maintenance and disclosure of certain financial information."  Id. at 56.  We rejected the relevance of the Buckley "major purpose" test — as it was merely "an artifact of the Court's construction of a federal statute," id. at 59 — and concluded that the PAC statute survived exacting scrutiny based on the government's "compelling interest in identifying the speakers behind politically oriented messages," id. at 57, 59.

Our NOM I analysis applies with equal force to our review of the BQC provision.  Here, as in NOM I, we reject appellants' attempt to frame their constitutional claim as a challenge to the BQC definition rather than to the reporting and disclosure requirements themselves.  Like Maine's PAC laws, section 1056-B "imposes three simple obligations on an entity qualifying as a [BQC]: filing of a registration form disclosing basic information, quarterly reporting of election-related contributions and expenditures, and simple recordkeeping."  Id. at 56. No less than in candidate elections, citizens evaluating ballot questions must

"rely ever more on a message's source as a proxy for reliability and a barometer of political spin." Id. at 57; see also, e.g., Cal. Pro-Life Council, Inc. v. Getman, 328 F.3d 1088, 1105-06 (9th Cir. 2003) ("'Even more than candidate elections, initiative campaigns have become a money game, where average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their self-interest.'" (quoting David S. Broder, Democracy Derailed: Initiative Campaigns and the Power of Money 18 (2000))). The disclosure of information about the source of political-advocacy funds thus "'enables the electorate to make informed decisions.'" NOM I, 649 F.3d at 57 (quoting Citizens United v. FEC, 130 S. Ct. 876, 916 (2010)).

We agree with the district court that such transparency is a compelling objective "in a climate where the number of ballot questions Maine voters face is steadily increasing." Nat'l Org. for Marriage, 765 F. Supp. 2d at 46; see also id. at 52 (noting that "'[k]nowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown'" (quoting Getman, 328 F.3d at 1106)). Hence, like the non-major-purpose PAC provision we upheld in NOM I, section 1056-B is consistent with the First Amendment because its modest disclosure and reporting

-10-

requirements are substantially related to "Maine's interest in disseminating information about political funding to the electorate." NOM I, 649 F.3d at 57.

In so concluding, we reject appellants' argument that our decision in NOM I does not govern this case because the BQC regulation is supported by only a single state interest — informing the electorate — while additional interests may justify the regulation of PACs. Our decision in NOM I rested solely on the State's interest in "disseminating information about political funding to the electorate," id. at 57-58 & n.34 — an interest equally applicable to the BQC setting.

## B. The $100 Reporting Threshold

Given the importance of transparency in the public dialogue about ballot measures, and our decision in NOM I upholding the $100 threshold in Maine's independent expenditure reporting provision, see id. at 59-61, we can easily reject appellants' challenge to section 1056-B's reporting requirement for contributions from a single source that, in the aggregate, exceed $100.

The applicable inquiry is whether the legislature's judgment to set a $100 reporting threshold is "wholly without rationality." Id. at 60. Our analysis in NOM I confirms that it is not, see id. at 59-61, and the district court's clear

-11-

articulation reveals why the $100 threshold is narrowly tailored to meet Maine's compelling interest in informing voters:

> The public has an interest in knowing . . . that a ballot measure has been supported by a multitude of gifts, even small gifts, from a particular state or from a specific profession. Such information could be crucial in the context of ballot measures involving public works projects or regulatory reform. The issue is thus not whether voters clamor for information about each "Hank Jones" who gave $100 to support an initiative. Rather, the issue is whether the "cumulative effect of disclosure ensures that the electorate will have access to information regarding the driving forces backing and opposing each bill."

Nat'l Org. for Marriage, 765 F. Supp. 2d at 52 (quoting ProtectMarriage.com v. Bowen, 599 F. Supp. 2d 1197, 1211 (E.D. Cal. 2009)). Hence, the $100 threshold survives appellants' constitutional attack.[7]

## C. Due Process Vagueness

### 1. The Challenged Language

Appellants assert that two parts of Maine's definition of "contribution" are unconstitutionally vague and that, by extension, the BQC definition relying on that term also is flawed.

---

[7] Contrary to appellants' assertion, the failure to index the threshold to inflation does not render it faulty. See NOM I, 649 F.3d at 61 (rejecting NOM's challenge to the $100 PAC threshold based on the failure to index and noting that "[n]either we nor the Supreme Court has ever second-guessed a legislative decision not to index a reporting requirement to inflation").

Specifically, they challenge subsections B and C of section 1056-B's four-part definition of contribution:

> B.     Funds provided in response to a solicitation that would lead the contributor to believe that the funds would be used specifically for the purpose of initiating or influencing a campaign;
>
> C. Funds that can reasonably be determined to have been provided by the contributor for the purpose of initiating or influencing a campaign when viewed in the context of the contribution and the recipient's activities regarding a campaign . . . .

Me. Rev. Stat. Ann. tit. 21-A, § 1056-B(2-A)(B), (C). Appellants contend that the phrase "for the purpose of . . . influencing" that appears in both subsections is vague, and they also argue that each subsection is flawed by its reliance on a subjective factor (the contributor's belief in subsection B and the contributor's purpose in subsection C). They further challenge the invocation of context in subsection C.

### 2. Standing

As a threshold matter, defendants assert that NOM and APIA may not bring a Due Process vagueness challenge because they undertook activities clearly covered by the statute. They rely on the Supreme Court's recent decision in Holder v. Humanitarian Law Project, 130 S. Ct. 2705 (2010), where the Court reaffirmed that "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." Id. at 2719 (quoting Hoffman Estates v.

-13-

Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982) (alteration in original)). The principle extends to the First Amendment context, even though "a heightened vagueness standard applies." Id.

It is undisputed that NOM received contributions clearly governed by section 1056-B and that APIA stated its intention to solicit such contributions. Appellants' complaint lists thirteen emails distributed by NOM between May and September 2009, most of which referenced the Maine referendum effort and some of which explicitly requested donations to help in the fight against same-sex marriage in Maine and elsewhere. See Compl., ¶¶ 26-38; see also Nat'l Org. for Marriage, 666 F. Supp. 2d at 211 (reproducing portions of seven of the emails).[8] The complaint also states that APIA intended to solicit donations to defray the cost of running two television ads opposing gay marriage "during the current election cycle and in future elections." Compl., ¶ 51; see also Nat'l Org. for Marriage, 765 F. Supp. 2d at 44 (describing the proposed APIA broadcast advertisements). Funds generated in response to explicit solicitations clearly would fall within the definitions of "contribution" articulated in subsections B and C of

_____

[8] The complaint also lists an article in a NOM newsletter that described the organization's participation in the Maine ballot-measure campaign, and stated: "Your support [for] NOM is critical to the success of this effort." The newsletter included a donation card and a return envelope for donations. Compl., ¶ 40; see also Docket No. 114-4, at 4.

-14-

section 1056-B. Requests for donations to support the campaign against same-sex marriage in Maine could only reasonably lead a responding contributor to believe that the money would be used for that purpose (triggering subsection B) and also would reasonably lead the solicitor to conclude that they were given with that purpose in mind (triggering subsection C). Indeed, appellants acknowledge that the contribution definition is not vague as applied to all of their speech.

Given the statute's acknowledged clear application to "some" of appellants' activities, defendants are correct insofar as they insist that appellants may not bring a <u>facial</u> vagueness challenge to section 1056-B. <u>See</u> <u>Humanitarian Law Project</u>, 130 S. Ct. at 2719; <u>Parker</u> v. <u>Levy</u>, 417 U.S. 733, 756 (1974) ("One to whose conduct a statute clearly applies may not successfully challenge it for vagueness."). In this context, however, it does not necessarily follow that the statute's undisputed application to some of appellants' financial dealings means that they cannot succeed with an as-applied vagueness challenge focused on other activities. Section 1056-B's enforcement mechanism is not necessarily triggered when entities engage in one or more instances of financial activity within the scope of the statute. The disclosure and reporting obligations do not attach until contributions or expenditures reach the $5,000 threshold.

-15-

Appellants' complaint asserts the incremental importance of each individual contribution:

> 43.   Depending on which, if any, of the donations for the above listed emails and newsletters are considered "contributions" for purposes of section 1056-B, NOM is either near or has already exceeded the $5,000 threshold for ballot question committee status.

> 44.   NOM intends to distribute further emails and newsletters mentioning Maine and soliciting donations, which will exceed $5,000, both during the current election cycle and in future elections.  However, NOM fears enforcement under section 1065-B based on any such future activities, as well as for activities already engaged in.

Compl., ¶¶ 43, 44.  Hence, if contributions clearly within the statute's scope fall short of the $5,000 mark, appellants theoretically may succeed with as-applied vagueness challenges based on other donations that they fear may bring their covered funds up to $5,000.

Appellants, however, do not address in their brief the vagueness problem with respect to donations received following any specific communication they distributed or proposed.  Rather, they assert in conclusory language that subsections B and C of section 1056-B "are unconstitutionally vague as applied to most of Plaintiffs' speech."  They make glancing reference to the content of the emails, noting that "some of NOM's solicitations mentioned Maine," and query whether, as a result of those mentions, donors' knowledge of the Maine ballot measure would be enough to make their

-16-

donations covered "contributions" and NOM a BQC. They do not explain why they were unable, or would be unable, to link particular contributions received to their advocacy efforts on the Maine referendum, focusing their arguments instead on the language of the statute generally.[9]

Thus, appellants are not only unable to bring a facial vagueness challenge to section 1056-B, but their failure to develop their as-applied challenges also would allow us to reject those claims summarily if we were so inclined.[10] See Harron v. Town of Franklin, 660 F.3d 531, 535 n.2 (1st Cir. 2011); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Given the importance of the issues raised, however, and the resources expended by all parties in this extensive litigation, we choose to explain why their vagueness contentions would in any event be substantially, if not entirely, unavailing. See Costa-Urena v. Segarra, 590 F.3d 18, 30 (1st Cir. 2009) (noting that "in certain circumstances we have

[9] Appellants invoke the specific communications they disseminated merely by citing to the paragraphs of their complaint describing NOM's email messages and newsletter article, and APIA's proposed television ads (i.e., "See A[ppendix] 30-A[ppendix] 36"). The citation includes a parenthetical excepting three of the emails and the newsletter piece from their argument — presumably the speech that they concede elicited contributions clearly covered by section 1056-B. Two of those three emails are reproduced in section II.C.5.

[10] Indeed, APIA appears to lack standing to bring an as-applied challenge. Its proposed activities – to air broadcast advertising plainly aimed at influencing the ballot question campaign and to raise funds for that purpose – involve expenditures and contributions clearly covered by section 1056-B.

the discretion to overlook waiver by inadequate argument" (citation omitted)); cf. Nat'l Ass'n of Social Workers v. Harwood, 69 F.3d 622, 628 (1st Cir. 1995) (noting that the presence of a constitutional issue is "a factor that favors review notwithstanding . . . procedural default"); In re Two Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 994 F.2d 956, 961 (1st Cir. 1993) ("To the extent that an issue is one of law rather than fact, can be resolved without doubt on the existing record, and is likely to arise in other cases, an appellate court may, in the interests of justice, choose to overlook a procedural default.").

### 3. Standard of Review

Our task when evaluating a due process vagueness challenge to a statute affecting First Amendment freedoms is "to ensure that persons of ordinary intelligence have 'fair warning' of what [the] law prohibits," that the law "provide[s] explicit standards for those who apply" it, and that the law "avoid[s] chilling the exercise of First Amendment rights." NOM I, 649 F.3d at 62 (quoting Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972) (internal quotation mark omitted)). Precision is not expected; "[t]he mere fact that a regulation requires interpretation does not make it vague." Id. (quoting Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 93 (1st Cir. 2004)); see also Humanitarian Law Project, 130 S. Ct. at 2719 (noting that, when a

-18-

law burdens First Amendment rights, "a more stringent vagueness test should apply . . . [b]ut perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity" (quoting Hoffman Estates, 455 U.S. at 499; United States v. Williams, 553 U.S. 285, 304 (2008) (quoting Ward v. Rock Against Racism, 491 U.S. 781, 794 (1989)))). The test is whether the statute "prohibits . . . an act in terms so uncertain that persons of average intelligence would have no choice but to guess at its meaning and modes of application." NOM I, 649 F.3d at 62 (quoting United States v. Councilman, 418 F.3d 67, 84 (1st Cir. 2005) (en banc)) (internal quotation marks omitted). Our review is de novo. NOM I, 649 F.3d at 62.

### 4. "Influencing"

In NOM I, where we faced essentially the same vagueness challenge to the use of the word "influencing" in the PAC provisions, we relied on a narrowing construction adopted by the Commission for section 1056-B – i.e., the provision that is now before us. As we explained there, the Commission's written Guidance clarifying section 1056-B stated that the various action terms in the then-current version of the provision – "initiating, promoting, defeating or influencing in any way" – applied to

> communications and activities which expressly advocate for or against a ballot question or which clearly identify a ballot question by apparent and unambiguous reference and are susceptible of no reasonable interpretation

-19-

other than to promote or oppose the ballot
question.

NOM I, 649 F.3d at 66 (quoting Me. Comm'n on Governmental Ethics &
Election Practices, Guidance on Reporting as a Ballot Question
Committee).[11]  We held that the PAC provisions' use of the term
"influencing," "so limited, is not so vague as to offend due
process."  Id. at 67.  A fortiori, given that the Guidance was
generated to clarify section 1056-B, our conclusion there — that
the narrowed formulation "succeeds both in 'provid[ing] explicit
standards for those who apply' the provision[] . . . and in
ensuring that persons of average intelligence will have reasonable
notice of the provision[']s[] coverage" — applies here as well.
Id. (quoting Grayned, 408 U.S. at 108).

In their reply brief, appellants assert that the Guidance
is unconstitutionally vague because it incorporates the "appeal-to-
vote" test, which they claim is itself unconstitutionally vague.
We rejected this unfavorable view of the appeal-to-vote test in NOM
I.  See id.  We likewise reject appellants' contention here that
the Guidance is unclear because it describes the regulated conduct,
in part, in appeal-to-vote terms — i.e., communications and
activities "susceptible of no reasonable interpretation other than

---

[11] The Guidance provides answers to a series of questions about
the BQC law and is available on the Commission's website at
http://www.maine.gov/ethics/bqcs/guidance.htm (last visited Jan.
25, 2012).  The Guidance has been revised in accordance with the
current statutory language and no longer includes the words
"promoting" or "defeating" in its explanation.

to promote or oppose [a] ballot question."  See FEC v. Wis. Right to Life, Inc., 551 U.S. 449, 469-70 (2007) (articulating the appeal-to-vote test in holding that an advertisement could be regulated without triggering overbreadth concerns if it were "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate").  Indeed, as we noted in NOM I, the Supreme Court relied on the appeal-to-vote test in its most recent campaign-finance decision.  See NOM I, 649 F.3d at 69 (citing Citizens United, 130 S. Ct. at 889-90); see also Wis. Right to Life, 551 U.S. at 474 n.7 (explaining that the appeal-to-vote formulation meets the "imperative for clarity" in regulation of political speech).

Moreover, as the district court recognized, the phrase "for the purpose of influencing" was of concern in the context of candidate elections because of the possibility that it would be understood to cover issue advocacy as well as express advocacy for the election or defeat of a candidate.  See Nat'l Org. for Marriage, 765 F. Supp. 2d at 53 n.86.  "For state ballot question committees, however, only issue advocacy is involved, and there is no vagueness."  Id.

**5. Subsection B ("Funds provided in response to a solicitation that would lead the contributor to believe that the funds would be used specifically for the purpose of initiating or influencing a campaign")**

Appellants assert that subsection B articulates a standard that "focus[es] on what those who hear speech understand," and argue that they cannot know "for sure" whether solicitations "would lead the contributor to believe" that funds would be used for advocacy concerning a ballot measure. They contend that the provision places the speaker "'wholly at the mercy of the varied understanding[s] of [their] hearers,'" which has the impermissible chilling effect of self-censorship. Appellants' Br. at 24 (quoting Buckley, 424 U.S. at 43) (second alteration in original).

As we have explained, a facial vagueness challenge to the statute is unavailable because appellants concede that the contribution definition is not "impermissibly vague in all of its applications." Hoffman Estates, 455 U.S. at 497. Although we have chosen to respond to appellants' as-applied challenge in part, we decline to examine in detail each of the communications listed in appellants' complaint to evaluate the clarity of section 1056-B's application to subsequently received donations. Appellants did not undertake such a particularized analysis, and we are unwilling to excuse the deficiencies in their briefing by developing the argument for them. Instead, we can explain the flaws in their contentions about the statute's constitutionality by reviewing a selection of the NOM emails identified in the complaint.

-22-

At least half of NOM's thirteen listed emails paired information about the organization's efforts to overturn the pending Maine law allowing same-sex marriage with explicit requests for financial support – clearly constituting "solicitation[s] that would lead the contributor to believe that the funds [donated] would be used specifically for the purpose of initiating or influencing a campaign."  Me. Rev. Stat. Ann. tit. 21-A, § 1056-B(2-A)(B).  Among those emails, for example, are two that NOM appears to concede do not raise vagueness problems.  The first of those, sent on May 6, 2009, stated:

> Your support today will allow us to start the referendum process immediately when the law is signed, ensuring that the measure does not take effect before the people of Maine have had their say.  Can you afford a gift of $35, $50 or $100 today to help stop same-sex marriage not just in Maine, but in New Hampshire, Iowa, and other states as well?  <u>Please use this hyperlink to make a secure online donation today</u>.

Docket No. 114-2, at 2-3.  NOM estimated that it received approximately $2,469 as a result of this communication.  Compl., ¶ 26.  The second of the pair, sent on July 10, described efforts "to repeal Maine's hastily enacted gay marriage statute" and stated:

> The National Organization for Marriage worked hard with <u>StandforMarriageMaine</u> [a Maine PAC] to make this happen.  But it could not have happened without your help!  You are the ones who made this happen . . . and we need you to help secure this victory.  Can you help us with $10, $25, or $100 so that Maine – and our

-23-

country – can <u>recover the true meaning of marriage</u>?

Docket No. 114-2, at 14. NOM estimated that this email produced approximately $350 in donations. Compl., ¶ 32.

Two other emails apparently not within NOM's concession present similar messages. An email sent on May 8, 2009 described activities in the District of Columbia, Maine, and New Hampshire and included the following solicitation, in boldface type:

> <u>You can fight back! Can you help defend marriage in Maine and across the country, by donating $5, $10, or even, if God has given you the means, $100 or $500?</u>

Docket No. 114-2, at 4. NOM estimated receiving about $1,055 in donations in response to the email. Compl., ¶ 27. Another email on August 28, 2009, which drew an estimated $395 in donations, described a recent article about NOM executive director Brian Brown and highlighted events in Iowa. The email included the following sentence: "Help us fight to protect marriage in Iowa, Maine and everywhere across this great land – <u>donate today</u>!" Compl., ¶ 37; Docket No. 114-3, at 12. A reasonable contributor could not help but believe that donations made in response to these and similar solicitations "would be used specifically for the purpose of initiating or influencing a [Maine] campaign." Me. Rev. Stat. Ann. tit. 21-A, § 1056-B(2-A)(B).[12]

_____

[12] Appellants have not challenged the statute on appeal based on the failure to pro rate contributions among the states mentioned in the solicitations. <u>See</u> <u>Nat'l Org. for Marriage</u>, 666 F. Supp. 2d

-24-

Drawing on the language quoted above from <u>Buckley</u> and noting its repetition in <u>Wisconsin Right to Life</u>, appellants emphasize that a regulation of political speech must focus on the content of the message itself and not on the hearer's understanding. Even if that requirement were categorical – and NOM does not say it is – it would be fulfilled by subsection B. The question asked is whether the words spoken – the "solicitation" – would lead a contributor to believe that the funds will be used to initiate or influence a campaign. The answer does not require an assessment of what any particular contributor actually believed, an inquiry that could turn on the hearer's education, culture, or other background factors. Rather, whether a communication is covered depends on the objectively reasonable meaning of the language of the solicitation; hence, the only relevant hearer is the hypothetical "reasonable person."

We acknowledge, as appellants argue, that a standard may be both objective and vague. As applied to the communications described above, however, there is nothing imprecise about the

---

at 212 (noting that "[t]he clear language of the statute requires reporting the entire amount"). Appellants summarily assert that section 1056-B improperly regulates speech outside Maine, but link that assertion only to the district court's conclusion that Maine may require "organization-wide reporting" so the Commission "can assess the legitimacy of how the organization reports its information." <u>Nat'l Org. for Marriage</u>, 765 F. Supp. 2d at 49 n.76. To the extent appellants claim the statute has improper extraterritorial impact, the argument is undeveloped and, hence, forfeited.

language or the target of the provision. Subsection A, which is not challenged here, governs contributions that "the contributor specified were given in connection with a campaign" – i.e., earmarked donations. Subsection B governs contributions that, in effect, are earmarked by the solicitor – those that the contributor would understand as intended for use in ballot campaigns because of the solicitor's "earmarking" words. As the district court observed, rejecting subsection B as a lawful complement to subsection A "would allow the solicitor to propose all the relevant limitations and conditions in the solicitation, then argue unfairly that the resulting gift that did not expressly repeat those limitations and conditions could not be characterized as to purpose." Nat'l Org. for Marriage, 765 F. Supp. 2d at 51.

We have no difficulty concluding that organizations like NOM and APIA can be fairly required by Maine law to determine whether a reasonable listener would understand their advocacy as an invitation to contribute to a specific ballot question campaign. The scope of subsection B "may not be clear in every application," Humanitarian Law Project, 130 S. Ct. at 2720, but appellants have identified no circumstances in which they would be unable to recognize contributions that the Commission would deem within the statute's scope based on the perspective of a reasonable

contributor. Hence, we reject appellants' argument that subsection B is unconstitutionally vague as applied to them.[13]

### 6. Subsection C ("Funds that can reasonably be determined to have been provided by the contributor for the purpose of initiating or influencing a campaign when viewed in the context of the contribution and the recipient's activities regarding a campaign")

Subsection C triggers somewhat closer examination because it relies by its terms not only on words spoken by the solicitor or donor, but also on context. In addressing an as-applied challenge to campaign finance regulations, the Supreme Court cautioned lower courts against examining background information where such scrutiny could become "an excuse for discovery or a broader inquiry" that might chill "core political speech." Wis. Right to Life, 551 U.S. at 474, 468.[14] The Court acknowledged, however, that "basic

_____

[13] Appellants also appear to argue that the definitions of "contribution" in subsections B and C are overbroad because they extend to donations beyond those expressly earmarked by donors to support or oppose ballot measures. Unsurprisingly, appellants offer no support for the contention that the State may regulate only explicitly earmarked funds. Such a limitation would allow entities to easily evade disclosure requirements by guiding the content of donors' messages, defeating the State's compelling interest in informing voters. See Nat'l Org. for Marriage, 765 F. Supp. 2d at 51. We reject any such argument out of hand.

[14] In Wisconsin Right to Life, the Court addressed an as-applied challenge to Section 203 of the Bipartisan Campaign Reform Act of 2002 ("BCRA"), which barred corporations from disseminating communications via broadcast media that targeted voters and named a candidate for federal elected office. 551 U.S. at 455-56. The Court held that the statute was unconstitutional in its application to three radio and television ads because they constituted issue advocacy rather than campaign speech. In so concluding, the Court held that "the proper standard for an as-applied challenge to [the statute] must be objective, focusing on the substance of the

background information" may be necessary to put a communication in context, and it mentioned the factor of timing — "such as whether an ad describes a legislative issue that is either currently the subject of legislative scrutiny or likely to be the subject of such scrutiny in the near future" — as one possibly relevant consideration. Id. at 474 (internal quotation mark omitted).

Assuming the Supreme Court's caution regarding the use of background facts may be imported from its setting involving a content restriction on speech to this vagueness challenge to a disclosure law, that limitation does not concern us. The language of subsection C — though "clumsy," Nat'l Org. for Marriage, 765 F. Supp. 2d at 51 — is clear enough: it targets contributions that the recipient would reasonably understand to be "for the purpose of initiating or influencing a campaign," Me. Rev. Stat. Ann. tit. 21-A, § 1056-B(2-A)(C), in circumstances where there is no explicit request from the solicitor (covered by subsection B) or express

communication rather than amorphous considerations of intent and effect." Id. at 469. The Court then elaborated:

> It must entail minimal if any discovery, to allow parties to resolve disputes quickly without chilling speech through the threat of burdensome litigation. And it must eschew "the open-ended rough-and-tumble of factors," which "invit[es] complex argument in a trial court and a virtually inevitable appeal." In short, it must give the benefit of any doubt to protecting rather than stifling speech.

Id. (quoting Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 547 (1995)) (alteration in original) (citations omitted).

earmarking by the donor (covered by subsection A). The statute does not require inquiry into what the parties in fact understood, avoiding the pitfalls of subjective standards. Cf. Wis. Right to Life, 551 U.S. at 468 ("[A]n intent-based test would chill core political speech by opening the door to a trial on every ad . . . on the theory that the speaker actually intended to affect an election, no matter how compelling the [contrary] indications[.]"). Rather, the statute's applicability turns on an objective assessment of what a reasonable recipient would have concluded, and that assessment necessarily will be based primarily on the recipient's own conduct and communications, i.e., its "activities regarding a campaign."

Here, for example, NOM's list of emails includes one distributed on July 31, 2009 that, according to the complaint, "focused on events related to same-sex marriage in Maine, and mentioned that 'StandforMarriageMaine.com has turned in an extraordinary 100,000 signatures to overturn gay marriage.'" Compl., ¶ 34. As described in the complaint, this communication did not include an explicit solicitation and, hence, might be thought to fall outside the scope of subsection B's coverage of "[f]unds provided in response to a solicitation."[15] Me. Rev. Stat.

---

[15] In fact, however, the full email reproduced in the record contained multiple requests for donations. After noting NOM's efforts in the Maine signature drive, the July 31 email stated:

[I]t is your financial sacrifices which have made our

-29-

Ann. tit. 21-A, § 1056-B(2-A)(B). Whether or not subsection B applies, subsection C plainly does. In "context" — i.e., in light of NOM's ongoing role in the effort to overturn the Maine gay marriage law by referendum — the $255 in donations that NOM attributed to the email could only "reasonably be determined to have been provided by the contributor for the purpose of . . . influencing" the Maine campaign and similar efforts elsewhere. Id. § 1056-B(2-A)(C); Compl., ¶ 34.

Other similarly inexplicit emails in NOM's list would necessarily lead to the same conclusion. To give one more example, NOM distributed a communication on September 4, 2009 stating that "[m]arriage is now officially on the ballot in Maine this November" and that "[m]oney is going to be critical to getting the message out." Compl., ¶ 38; Docket No. 114-3, at 14. The email asked readers to donate to Stand for Marriage Maine. Although we think that a reasonable contributor who sent money to NOM in response to

---

initial victory possible. When you donate to NOM, you're creating the next round of good news! Can you give $5, $25, or even $100 today to <u>win the next victory for marriage</u>?

Docket No. 114-3, at 4. Later in the email, after a paragraph explaining why "Maine is about more than Maine" in the campaign against same-sex marriage, the reader was told that "ordinary people like you can still make a difference! Even a small donation — <u>maybe a monthly pledge of just $10</u> — can help us make your voice heard." <u>Id.</u> In addition, this message, like each of the twelve other emails listed in the complaint, contained a hyperlinked "Donate" button that sent potential donors to the donations screen at NOM's website. Compl., ¶ 39.

this communication would expect NOM to use the funds to influence the referendum campaign – thus triggering subsection B – subsection C eliminates any doubt that such contributions, even though prompted by an explicit solicitation on behalf of a separate organization, would fall within the scope of section 1056-B. Given NOM's prominent role in the Maine campaign and the urgent tone of the message, NOM reasonably could predict that donations it received as a result of this email would be classified by the Commission as "for the purpose of" influencing the upcoming Maine election.

Moreover, in evaluating any such donations, it is also significant that the relationship between NOM and Stand for Marriage Maine was extremely close during the 2009 campaign. NOM's executive director was a member of Stand for Marriage Maine's executive committee, and he was identified as one of the PAC's "primary decision-makers and fundraisers." Nat'l Org. for Marriage, 666 F. Supp. 2d at 200. NOM provided a total of $1.6 million to the PAC as of October 20, 2009. Id.; see also NOM I, 649 F.3d at 48 (noting that NOM spent $1.8 million in Maine in 2009). Such objective information, along with the timing of the contributions relative to the election, reasonably should inform "the context of the contribution." Me. Rev. Stat. Ann. tit. 21-A, § 1056-B(2-A)(C). Indeed, in keeping with the illustrative permissible background information cited by the Court in Wisconsin

Right to Life, timing is a particularly key contextual clue that a contribution should be deemed within the scope of subsection C.

In sum, we see no constitutional problem with expecting entities like appellants to make pragmatic, objective judgments about the nature of the contributions they receive where their own conduct and communications are the primary elements in the determination. Appellants have not demonstrated that subsection C is unconstitutionally vague as applied to any of their actual or anticipated contributions. Hence, as presented here, their vagueness challenge to subsection C fails. Cf. Humanitarian Law Project, 130 S. Ct. at 2720 (noting that "the scope of the . . . statute may not be clear in every application[,] [b]ut the dispositive point here is that the statutory terms are clear in their application to plaintiffs' proposed conduct").

## III.

For the reasons set forth above, we conclude that section 1056-B satisfies constitutional standards. Appellants have demonstrated no circumstances in which the statute fails to provide them fair warning of its reach. Hence, we reject their due process vagueness claim. The provision's $100 reporting threshold is narrowly tailored to meet Maine's compelling interest in an informed electorate. The statute is not overbroad in violation of the First Amendment. Accordingly, we affirm the judgment of the district court.

So ordered.