**Steven E. HAMMER individually and on behalf of all others similarly situated, Plaintiffs,**

**v.**

**SAM'S EAST, INC. d/b/a Sam's Club, et al., Defendants.**

**Case No. 08–0788–CV–W–HFS.**

United States District Court, W.D. Missouri, Western Division.

Oct. 16, 2012.

Jerome M. Patience, Kelly L. McClelland, Kenneth Eugene Cox, Ryan L. McClelland, McClelland Law Firm, Liberty, MO, R. Frederick Walters, Karen Wedel Renwick, Matthew Robert Crimmins, Walters Bender Strohbehn & Vaughn, PC, Kansas City, MO, for Plaintiffs.

Gregory K. Wu, James Richard Eiszner, Rebecca J. Schwartz, Scott H. Aripoli, Shook, Hardy & Bacon, LLP, Kansas, MO, for Defendants.

## MEMORANDUM AND ORDER

HOWARD F. SACHS, District Judge.

The Fair and Accurate Credit Transactions Act (sometimes called FACTA) requires expungement (truncation) of some credit card numbers before disclosure on printed receipts that a merchant supplies to a purchaser. 15 U.S.C. § 1681c(g). Only "the last 5 digits of the card number" may be displayed on the receipt. The statute and the industry sometimes refer to this as the "account number" on the card.

The Sam's Club defendants, affiliated with Wal–Mart, partner with General Electric in the financing of credit to Sam's Club "members" who use private label credit cards. Some years ago, prior to enactment of the statute in question, the potential difficulty presented here was created when "membership numbers" were printed on the credit cards and most of the same numbers in sequence were also displayed on the cards as the "account number" or "credit card number." When various States and later the Federal Government required redacting or truncating the credit card numbers on receipts, the defendants say they complied in a literal sense by reducing that set of displayed numbers, but they did not alter or delete the long string of nearly identical membership numbers appearing on the cards.

The last four credit card numbers, as displayed on receipts, contained digits that match the last four digits on the membership number. This system continued after the Act became effective in 2006 and continued for several months after this lawsuit

was filed, purportedly as a class action, in 2008.[1]

The statute was enacted in 2003 in an effort to reduce the opportunity for identity theft. The misconduct contemplated would apparently typically begin with scavengers searching through trash containers near check-out counters at retail stores. A paper receipt "produced at the point of sale . . . may be dropped, mislaid, or discarded by the consumer in any manner of public places where it easily can be retrieved and put to nefarious use . . ." *Shlahtichman v. 1–800 Contacts, Inc.,* 615 F.3d 794, 802 (7th Cir.2010). Some ingenuity, but not a lot, is required to observe that although the credit card or account number shown on the receipt may not be conducive to fraud there is another number on the receipt that matches the disclosed digits of the credit card number. That invites speculation, accurate in this situation, that some or all of the expunged numbers may be the same as the exposed membership number.[2]

I have previously ruled that the limited truncation of "credit card numbers" is insufficient to comply with the Act. The exposed membership numbers violate the Act, despite the difference in labeling. The credit card *digits* were not concealed; they simply were displayed with a different name.

Now before me for ruling is defendants' motion for summary judgment on the issue of whether the violation of the Act by defendants was "willful." If so, the results could be drastic, if a class action were certified. A $100 minimum statutory re-

---

1. In light of my ruling below I will not rule plaintiffs' class action certification motion, briefed recently. Granting the motion would unnecessarily delay final disposition of this case, and I believe it inappropriate to invite card-holders to join in litigation that I conclude will not ultimately be productive.

2. Credit card fraud, which defendants say is insured against, has resulted in considerable losses at Wal–Mart. I am unaware, however, of an evaluation of receipt-scavenger fraud damage, and cannot assume there is a major fraud loss traceable to unguarded trash containers. Congress has acted, however, and the judiciary should not belittle the issue.

covery is specified for each purchaser who has used a credit card and been given a defective receipt. 15 U.S.C. § 1681n.

In an appellate decision earlier this year, Judge Easterbrook expressed apparent consternation that a major violator, if ruled "willful," would be required to pay a total sum "to everyone who has used a Shell Card at a Shell station (that) would exceed $1 billion despite the absence of a penny's worth of injury." *Van Straaten v. Shell Oil Products Company LLC*, 678 F.3d 486, 489 (7th Cir.2012). I take it the remark did not signify judicial disapproval of the legislation but rather suggested that Congress probably "knew not what they wrought." [3]

The *Van Straaten* court found no willfulness in any violation that occurred when Shell arguably truncated the wrong numbers on its credit cards, where the "account number" and the "card number" had been printed separately but on the same line of the cards.

In the only other significant appellate ruling on the issue of willfulness under this Act, the Third Circuit, also this year, found a violation, but rejected as a matter of law the claim of a willful violation. *Long v. Tommy Hilfiger U.S.A., Inc.*, 671 F.3d 371 (3rd Cir.2012) (the issue there was whether printing the expiration month, but not the year, willfully violated the statutory duty to expunge "the expiration date").

Both *Van Straaten* and *Long* refer for guidance on the issue of willfulness to the majority opinion of Justice Souter in *Safeco Insurance Co. v. Burr*, 551 U.S. 47, 127 S.Ct. 2201, 167 L.Ed.2d 1045 (2007), which will be discussed below.

Considering the submissibility to a jury of the issue of willfulness requires revisiting the violation. We are dealing with an exercise in semantics. As defendants have been arguing in their briefs, there was no explicit requirement in the Act that membership numbers as such be concealed, in whole or in part. Three years ago, however, in denying a motion to dismiss, I observed that a "sophisticated person attempting identity theft or misuse of credit cards would probably note" the replication of the exposed "credit card" digits as the last numbers appearing in the "membership number;" and I concluded that it is "the personalized number ... however described, that is protected by FACTA." Doc. 27, fn. 8, page 8. In granting partial summary judgment to plaintiffs this summer on the question of whether there had been a violation I again rejected the notion that merely describing or labeling the protected number as a membership number adequately complies with the Act. Doc. 220. But we have now moved to whether the violation can be considered a willful one. The answer does not flow easily from simply finding a violation, as *Van Straaten, Long,* and *Safeco* demonstrate.

Under a related consumer protection statute, but one that invokes the same $100 minimum award for willful violations, the Supreme Court in *Safeco* issued a split ruling. The Court agreed that there would be a violation when an insurer adopted a first-time premium for a policy applicant that was higher than the premium for an applicant with a better credit rating, if credit reports were relied on, without notifying the applicant of the information. The insurer's concept that a stat-

---

**3.** The exposure in this case may be in the multi-billion dollar range. See the figures appearing in plaintiffs' briefing regarding the number of "violating receipts" (pp. 66 and 74 in Doc. 237). It is unnecessary to closely calculate the number of card holders obtain-ing such receipts between the effective date of the Act and the filing of suit more than two years later to conclude that recovery of the statutory minimum award by all such users of the cards would yield an enormous sum of money.

utory rate " 'increase' presupposes prior dealing" was rejected. But the Supreme Court concluded that such a mistaken reading would not be "willful," and the insurer was thus exonerated from penal recovery as a matter of law. "(T)here was no need to remand ... for factual development." 551 U.S. at 71, 127 S.Ct. 2201.

Factual development was unnecessary because the Court ruled that "subjective bad faith" was not to be considered, but only an "objectively unreasonable" reading could justify an award for a willful violation. *Id.* at 70, n. 20, 127 S.Ct. 2201. A requirement of objective unreasonableness as a predicate for a willfulness award was reimposed in *Long*, for the Act here in question, based on the Supreme Court's guidance in *Safeco*. Perhaps because *Long* and *Van Straaten* were only recently decided, and the possible recovery is enormous, counsels' preparation and briefing has been extremely elaborate, going far beyond the issue of objective reasonableness of the mistaken reading of the Act.

The distinction between subjective and objective reasonableness most frequently appears in judicial rulings in law enforcement cases, where the objective test is controlling, and judicial concern is with the conduct of "a hypothetical reasonable officer," irrespective of motivation. *Scott v. Clay County, Tennessee,* 205 F.3d 867, 877 (6th Cir.2000). Compare the similar usage in other contexts, e.g., *National Organization for Marriage, Inc. v. McKee,* 669 F.3d 34, 47 (1st Cir.2012). In this case, to use *Safeco* again, our consideration may be limited to whether a hypothetical reasonable merchant or staff person could be considered so egregiously wrong in statutory compliance that the conduct "substantially" exceeded a "merely careless" reading and could properly be characterized as "wanton"—a term which the Court says, relying on Prosser and Keeton, "comes out" at the "same legal exit" as the termi-

nology of "willful" and "reckless." *Safeco,* supra, at 69 and 57, 127 S.Ct. 2201. This imposes a very high barrier for plaintiffs to cross. Willfully is a "word of many meanings" (*Id.*), but the three cases cited here control the application of the language in 15 U.S.C. § 1681n.

*Safeco* directs that consideration be given to whether the error occurred despite either appellate rulings to the contrary, agency guidance to the contrary, or violation of "pellucidly clear" statutory wording. *Id.* at 70, 127 S.Ct. 2201. Defendants here had no guidance except the bare wording of the statute in determining whether a "membership number" as well as a "credit card" or "account" number must be truncated.

Plaintiffs urge me to be consistent with what I said in earlier rulings; that is, in denying the motion to dismiss I said "the statute is clear" and that "unambiguous" language ended my inquiry. Doc. 27, page 8. But I also referred to plaintiffs' reading as simply "plausible" (enough to avoid a dismissal) and, most significantly in ruling that motion and in finding a violation, I was expressly relying on the purpose of the statute as well as its wording, and was giving the statute a liberal construction in finding a duty that had been violated. Id., Doc. 220, page 2.

We are now in different analytical territory. Was a mistaken reading objectively reasonable or willfully erroneous? I have no trouble agreeing with defendants on that question and concluding that a literal-minded company executive or employee, steeped in knowledge of the "difference" between membership numbers and credit card numbers (and their presently immaterial variations in numbering) could very well insistently assert that only the credit card number, so labeled, was the subject matter dealt with in the statute. Such a reading not only seems reasonably possible

but rather likely, at least for those not philosophically inclined to think about (or guess at) the Congressional purpose. Such readings are sometimes referred to as "wooden." But more than a few people in business could quite reasonably make the arguments earlier presented here by defendants' counsel.

Defendants contend that Congress decided, prior to tinkering with the language by this judge, that a certain item on receipts described as the "credit card number" should be truncated, and that is what defendants did, even before the Act was adopted. Congress mandated no other deletions on the receipts, and a preexisting number with a different label was, they say, not affected by the Act. While I disagree, and have so ruled, I recognize that pitting a strictly literal reading or theory of meaning against one influenced by understanding of purpose often occurs in legal controversies, and that willful unreasonableness can seldom be discerned when either choice is made. See, e.g., *State ex rel. KCP & L Greater Missouri Operations Company v. Cook*, 353 S.W.3d 14 (Mo.App.W.D.2011), an example of a divided court, with the majority decrying "parsing the language" to take a "very wooden approach to statutory interpretation."

I offer a further note intended to dispel suppositions of "inconsistency." As stated from the beginning, I used my understanding of Congressional purpose to drive my reading of the statute. Without consideration of Congressional purpose I could not fairly say that the meaning of the statute was quite clear. It was an easy call for me when I took purpose into account, and found it appropriate to read the statute as I thought Congress intended. Some judges, of course, prefer to let the Legislative Branch clean up its own wording. Judicial rulings this year, including this one, may point to a need to redo the penal award aspect of the statute.

Defense counsel have not, in my judgment, engaged in frivolous or patently unreasonable advocacy, in seeking dismissal and resisting summary judgment as to a statutory violation. If there has been careless, even slightly obstinate reading of the statute, unmindful of its purpose, the dereliction of duty has not been "substantially" greater than occurs in merely negligent conduct—and I am satisfied that the mistaken application could not be condemned as "wanton." A conclusion of willful misreading can and should be rejected as a matter of law.

Although I have rejected the invitation to deal with the issue of subjective reasonableness and actual motivation of defendants' personnel, it may be useful to briefly comment on some factual contentions of plaintiffs. Two issues are emphasized. There was apparently an internal recommendation by the Sam's Club Threat Research Team to alter the "membership number" postings on the credit cards. This may have occurred after enactment of the legislation in 2003 and before the effective date in 2006. Nothing that I have examined shows this to be a warning of illegality under the Federal Act, but instead seems to be simply a fraud-prevention warning. Plaintiffs thus conceivably would have a sound theory of management negligence or worse for failing to protect credit card numbers from disclosure. But not even negligent noncompliance with the Act is charged in this case, presumably because no known credit card holder has asserted actual harm.

The Act's truncation requirement is not referred to, expressly or by implication, in the Research Team material I have seen, or in any history referred to in plaintiffs' briefing. The situation mirrors a rebuttal point advanced by their expert, Paul Guthrie, when, in responding to defendants' contention that they had outside support

for the system they were using, he wrote that "PCI assessors [that is, Payment Card Industry assessors] do not look for or assess FACTA compliance." (P. 17, Exh. 3, Doc. 239).

Plaintiffs also assert there was a several months' period after suit was filed when subjective willfulness can be inferred from delay in remedial change in receipt disclosures. They note that at least one staff person may have agreed with their contention that a violation of the Act was occurring. See the Jason Todd memorandum of October 27, 2008, (Exh. 45, Doc. 239). There is no indication, however, that other employees or management officials with defendants may have agreed with the interpretation advanced in the complaint, and adopted by me only after giving consideration to the purpose of the Act. Even in 2012, my reading of the duties imposed by the statute is a judicial novelty.

It is my conclusion from the statutory text that objective unreasonableness rising to the level of willfulness cannot be found here. Even if I were authorized to probe the complexities of subjective unreasonableness, contrary to *Safeco*, on the elaborate record before me plaintiffs' case might not survive defendants' motion for summary judgment.

For the foregoing reasons, defendants' motion for summary judgment as to willfulness (Doc. 195) is GRANTED, and the motion for class certification (Doc. 124) and all other pending motions (Docs. 186, 191, 202, 203, 205, 231, and 233) are DENIED as moot.[4]

The relief sought by plaintiffs having been denied, the Clerk is directed to enter final judgment in favor of defendants.

SO ORDERED.

---

**4.** Both parties refer to a cross-motion by plaintiffs for summary judgment as to willfulness. The docket sheet contains no such entry. Apparently the reference is to language appearing at the end of plaintiffs' suggestions in opposition (Doc. 239) to defendants' motion that is ruled here. Motions and suggestions are separate documents. Local Rule 7.0(b) and (c). Attempting to tack motions onto unrelated suggestions tricks the computer. In any event a cross motion would be mooted by this ruling.