STATE OF MAINE                           BUSINESS AND CONSUMER COURT
CUMBERLAND, ss                           Location: Portland
                                         Docket No.: BCD-AP-14-02

THE NATIONAL ORGANIZATION        )
FOR MARRIAGE,                    )
                                )
              Petitioner,       )
                                )
     v.                         )
                                )    DECISION ON PETITIONER'S RULE
MAINE COMMISSION ON             )         80(C) APPEAL
GOVERNMENTAL ETHICAL            )
AND ELECTION PRACTICES,         )
                                )
              Respondent.       )

## I.     INTRODUCTION

This matter is before the court on National Organization for Marriage's ("NOM")

Petition for Review of Agency Action pursuant to M.R. Civ. P. 80C. Petitioner seeks review by

this Court of the June 30, 2014, determination by the Respondent, Maine Commission on

Governmental Ethical and Election Practices (the "Commission"), finding NOM in violation of

Maine's "ballot question committee" ("BQC") registration and reporting requirements pursuant

to 21-A M.R.S. § 1056-B.

## II.    FACTUAL BACKGROUND

NOM was founded in 2007 pursuant to Title 26 U.S.C. § 501(c)(4) as a social welfare

group with the mission to promote and preserve the institution of marriage as between one man

and one woman across the country. (R. 12.) In 2009, NOM and its Executive Director, Brian

Brown, had critical leadership roles in support of Maine's people's veto referendum to suspend a

recently enacted Maine law that would have allowed same-sex marriage. Stand for Marriage

Maine ("SMM") was a Political Action Committee ("PAC") dedicated to defeating the

legalization of same-sex marriage through the November referendum vote.[1] NOM was the biggest supporter of SMM. In total, NOM donated over $2 million, representing 64% of the total spent by the PAC. (R. 11.) NOM contends that it made no expenditures to promote the Maine referendum other than by contributions from SMM. *Id.*

NOM makes its donors aware of its efforts to protect the traditional definition of marriage through various emails and newsletters. In 2009, NOM sent a series of emails that mentioned or discussed the Maine referendum as well as other nationwide initiatives. The emails contained requests for donations to assist NOM in its efforts. However, NOM does not allow donors to earmark their contributions to specific projects promoted in the emails.[2] (R. 2.) In 2009, NOM generated over $5.5 million from fourteen (14) major donors. (R. 12.) NOM contends that in total, the emails that discussed the Maine ballot question raised less than $5,000, the threshold for BQC registration. (R. 152.) NOM disputes the Commission's determination and donation calculations behind one email, which is alleged to have generated $570 in donations. (R. 32.) NOM contends that the email made no specific reference to the Maine referendum. As such, NOM does not believe that the amount should count towards the $5,000 statutory limit. (R. 152.) NOM maintains that all donations were made in support of the Maine campaign came from NOM's general treasury and were not designated for any particular state's campaign. (R. 4.)

Despite NOM's role in funding the pro-referendum campaign, NOM did not register or file financial reports with the Ethics Commission as a Ballot Question Committee ("BQC")

---

[1] NOM's Executive Director, Brian Brown, formed SMM and served on its three-person executive committee as a primary fundraiser and decision-maker. (R. 14.)

[2] The First Circuit Court of Appeals rejected NOM's argument that a state may regulate only explicitly earmarked funds, noting that "[s]uch a limitation would allow entities to easily evade disclosure requirements by guiding the content of donors' messages, defeating the State's compelling interest in informing voters." *Nat'l Org. for Marriage, Inc. v. McKee* 669 F.3d 34, 47 n. 13.

2

pursuant to 21-A M.R.S. § 1056-B. Further, it did not publicly report its donors or any expenditure that it made to influence the referendum (other than by contributions to SMM).

On October 1, 2009, the Commission voted to investigate NOM to determine whether it was in violation of Maine campaign laws by not registering as a BQC under 21-A M.R.S. § 1056-B. (R. 1.) The investigation was based on concerns over large donations NOM made to SMM. *Id.* By the end of the campaign, NOM had reportedly donated $1.93 million to SMM. (R. 11.) In a final determination dated June 30, 2014, the Commission found NOM to be in violation and required NOM to register with the Commission as a BQC, file a consolidated campaign finance report for calendar year 2009, and pay penalties totaling $50,250. (R. 2.) The Commission unanimously denied NOM's request for a waiver or reduction of the penalties.

## III. STANDARDS OF REVIEW

### A. Appeal Pursuant to M.R. Civ. P. 80C

In its appellate capacity, the Court reviews agency decisions for "abuse of discretion, error of law, or findings not supported by the evidence." *Rangeley Crossroads Coal. v. Land Use Reg. Comm'n*, 2008 ME 115, ¶ 10, 955 A.2d 223. The Court must "examine the record to determine whether any competent evidence supports the Commission's findings, as well as to determine whether the Commission has applied the applicable law." *Bean v. Maine Unemployment Ins. Comm'n*, 485 A.2d 630, 632-33 (Me. 1984).

The petitioner bears the burden of proving that "no competent evidence supports the [Commission's] decision and that the record compels a contrary conclusion." *Bischoff v. Maine State Ret. Sys.*, 661 A.2d 167, 170 (Me. 1995). "Judges may not substitute their judgment for that of the [Commission] merely because the evidence could give rise to more than one result." *Gulick v. Bd. of Envtl. Prot.*, 452 A.2d 1202, 1209 (Me. 1982). Rather, the Court will defer to

3

the Commission's conclusions when based on evidence that "a reasonable mind might accept as adequate to support a conclusion." *Id.* In doing so, the Court must give great deference to the Commission's construction of its own rules and regulations "unless the rules or regulations plainly compel a different result." *Rangeley Crossroads Coal,* 2008 ME 115, ¶ 10, 955 A.2d 223.

## B. Statutory Framework

The Commission's investigation sought to determine whether NOM qualifies as a BQC pursuant to 21-A M.R.S. § 1056-B. A BQC is defined as an entity, other than a PAC, "who receives contributions or makes expenditures, other than by contribution to a political action committee, aggregating in excess of $5,000 for the purpose of initiating or influencing a campaign." *Id.* BQCs are required to file certain reports that include the name and address of each contributor. § 1056-B(2). A "contribution" is defined several ways, including:

A. Funds that the contributor specified were given in connection with a campaign;

B. Funds provided in response to a solicitation that would lead the contributor to believe that the funds would be used specifically for the purpose of initiating or influencing a campaign;

C. Funds that can reasonably be determined to have been provided by the contributor for the purpose of initiating or influencing a campaign when viewed in the context of the contribution and the recipient's activities regarding a campaign....

§ 1056-B(2-A). The First Circuit upheld the constitutionality of the BQC law, including its definition of "contribution." *Nat'l Org. for Marriage v. McKee,* 669 F.3d 34 (1st Cir. 2012). Whether NOM is a BQC depends in large part on the nature of donations it received in 2009 and whether those qualified as "contributions" under the statutory definition.

4

## IV. DISCUSSION

At issue in this appeal is whether the Commission correctly determined that NOM's activities in 2009 resulted in "contributions" triggering certain registration and reporting obligations as required by Maine law. The Court has considered each of NOM's arguments below.

### A. The Commission's Determination Was Consistent With Both Constitutional and Statutory Principles

#### 1. *Constitutional Vagueness*

In this case, Petitioner, for the third time,[3] asserts that Maine's BQC law is void for vagueness as applied to NOM. NOM contends that the Commission ignored key elements of the definition of "contribution." *See* 21-A M.R.S. § 1056-B(2-A)(A-C). Subsection B of said definition defines "contribution" as "[f]unds provided in response to a solicitation that would lead the contributor to believe that the funds would be used *specifically* for the purpose of initiating or influencing a campaign." *Id.* (emphasis added).

"A strong presumption of constitutionality attaches to all statutes, which will be construed, where possible, to preserve their constitutionality." *Maine Milk Producers, Inc. v. Comm'r of Agric., Food and Rural Res.*, 483 A.2d 1213, 1218 (Me. 1984)). "Any party attacking the constitutionality of a state statute thus carries a heavy burden of persuasion. In order to prevail . . . Petitioner[] must prove that no logical construction can be given to the words of . . . [the] Act that will make it constitutional." *Maine Assoc. of Health Plans v. State*, 2006 WL 2959744, at *2 (Me. Super. Aug. 4, 2006) (internal citations omitted). Further, it is clear in

---

[3] NOM questioned the validity of Maine's BQC law in both the United State District Court for the District of Maine and in the First Circuit Court of Appeals. In both cases, the respective courts determined that the language of 21-A M.R.S. § 1056-B(2-A)(B) is neither vague nor substantially overbroad. *See Nat'l Org. for Marriage v. McKee*, 765 F. Supp. 2d 38, 50 (D. Me. 2011) *aff'd sub nom. Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34 (1st Cir. 2012).

Maine that "the cardinal rule of statutory interpretation is to give effect to the intention of the Legislature." *See Cobb v. Bd. of Counseling Prof'ls Licensure*, 2006 ME 48, ¶ 11, 896 A.2d 271. The Court discerns legislative intent from the plain meaning of the statute and the context of the statutory scheme. *Id.* (citing *Brent Leasing Co., Inc. v. State Tax Assessor*, 2001 ME 11, ¶ 6, 773 A.2d 457.) "All words in a statute are to be given meaning, and none are to be treated as surplusage if they can be reasonably construed." *Id.*

NOM argues that the Commission misinterpreted the statute as it failed to give meaning to the word "specifically." NOM contends that the Commission's final determination expands the definition of contribution to include a wide range of donations received by organizations. (Br. of Pet. 15.) Under NOM's interpretation, a communication must *specifically* refer to a Maine ballot question independent of other questions and communication referring to the State of Maine generally is insufficient.[4] *Id.*

The Respondent Commission, on the other hand, contends that the Commission's interpretation of the BQC law is consistent with the Legislature's intent and the statute's plain language. Under NOM's interpretation of the word "specifically," a single communication discussing several topics in addition to a Maine ballot question would result in counting only a portion of donations received as "contributions." The Commission further contends that the plain meaning of the word "specifically" does not support NOM's narrow reading.[5] Rather, according to the standard dictionary definition, "specific" means "explicit, particular or definite;"

---

[4] For example, NOM argues that a May 15, 2009 email should not have been included in the Commission's tally towards the $5,000 BQC threshold, as it did not specifically refer to a Maine ballot question. The email stated in relevant part: "If it is Tuesday this must be Maine . . . I know it's Maine because I saw a moose . . . . We will fight to be your voice in New Hampshire, Maine (more on that next week), Iowa, New York, New Jersey, D.C., and all across this great and God-blessed country of ours." (R. 2100.)

[5] The Commission alleges that NOM interprets the word "specifically" to mean "exclusively." (Br. of Resp. 18.)

6

"relating to a specified or particular thing." *Collins English Dictionary – Complete &
Unabridged* (10th Ed. 2009); (Resp. Br. at 18.)

The Court's task when evaluating a due process vagueness challenge to a statute affecting
First Amendment freedoms is "to ensure that persons of ordinary intelligence have 'fair warning'
of what [the] law prohibits, [that the law] provide[s] explicit standards for those who apply [it,
and that the law] avoid[s] chilling the exercise of First Amendment rights." *Grayned v. City of
Rockford*, 408 U.S. 104, 108–09 (1972) (internal quotation mark omitted)); *Nat'l Org. for
Marriage, Inc. v. McKee*, 669 F.3d 34, 43-44 (1st Cir. 2012). The test is whether the statute
"prohibits . . . an act in terms so uncertain that persons of average intelligence would have no
choice but to guess at its meaning and modes of application." *United States v. Councilman*, 418
F.3d 67, 84 (1st Cir. 2005) (en banc) (internal quotation marks omitted).

In this case, NOM distributed emails between May and September 2009 referencing the
Maine referendum effort to fight same-sex marriage. While these emails also attempted to solicit
support for other referendum measures in other states, the court finds the Commission's
determination was based on substantial evidence in the record. Each of the subject email
communications contained a reference to NOM's need for support in Maine.[6] In determining
whether the emails should count towards the BQC threshold, the Commission, like the First
Circuit, applied a reasonable person test. Under said test "whether a communication is covered
depends on the objectively reasonable meaning of the language of the solicitation; hence, the
only relevant hearer is the hypothetical 'reasonable person.'" *Nat'l Org. for Marriage, Inc. v.
McKee*, 669 F.3d at 47. The Commission determined that based on the language of the
correspondence, a reasonable contributor would believe that donations made in response would

---

[6] Said emails mentioned NOM's efforts in Maine and sought to encourage supporters to donate. While
some emails directed supporters to SMM's website, a prominent red "donate button' offered to lead
supporters directly to NOM's fundraising page. (R. 26.)

7

be used specifically for the purpose of influencing the Maine referendum campaign.[7] (R. 34.) The Commission found that the revenue generated by the subject emails was $5,479, which exceeded the $5,000 threshold requiring ballot question committee registration. *Id.*

NOM's argument that correspondence must exclusively refer to a Maine ballot measure to trigger BQC registration requirements is unpersuasive. NOM's interpretation runs contrary to the Legislature's intent and to Maine's interest in disseminating information about political funding to the electorate. *See Nat'l Org. for Marriage, Inc. v. McKee,* 669 F.3d at 40. Under NOM's narrow interpretation, certain contributors may remain anonymous so long as the correspondence soliciting donations was broad enough to include other referendum measures and issues.

The Court finds that the word "specifically" in 21-A M.R.S. § 1056-B(2-A)(B) is not ambiguous or vague on its face or as applied to NOM. "The mere fact that the Legislature has not spoken 'in precise and pellucid language, failure to meet this Olympian standard' does not render [the statute] void for vagueness." *Maine Assoc. of Health Plans v. State,* 2006 WL 2959744, at *2 (Me. Super. Aug. 4, 2006) (citing *Maine Milk Producers,* 483 A.2d 1213, 1221 (Me. 1984)). Notwithstanding this conclusion, the Court finds that even if the statute were ambiguous, the Commission's interpretation is reasonable.[8] *Arsenault v. Sec'y of State,* 2006 ME 111, ¶ 11, 905 A.2d 285, 288 (noting "when a statute is ambiguous [the court] defer[s] to the

---

[7] As mentioned above, NOM challenges the Commission's finding as to the May 15, 2009, email as NOM did not specifically reference the Maine campaign. However, the Court finds that the Commission's determination was reasonable and based on substantial evidence in the record.

[8] Because the Court finds that the Commission's interpretation of the statute was reasonable, the Petitioner's argument that the Commission exceeded its statutory authority by regulating conduct not contemplated by the plain language of the statute is without merit.

8

interpretation of the agency charged with its administration, if the agency's interpretation is reasonable").[9]

2. *Bias*

The Maine Administrative Procedure Act requires that the Commission's proceedings be conducted impartially. *Fox Islands Wind Neighbors v. Me. Dep't of Envt'l Prot.*, 2014 Me. Super. LEXIS 30 (Me. Super. Ct., Mar. 10, 2014). In Maine, there is a presumption that the Commission acted in good faith. *Id.* at 31; *see also Friends of Maine's Mountains v. Bd. of Envtl. Prot.*, 2013 ME 25, ¶ 23, 61 A.3d 689. However, NOM contends that specific decisions by the Commission demonstrate bias against NOM sufficient to rebut this presumption and reverse the Commission's determination. (Br. of Pet. 7.) For the reasons set forth below, the Court disagrees.

i. *The Commission's Decision to Investigate*

Pursuant to 21-A M.R.S. § 1003(2), a person may apply to the Commission to investigate whether an organization has violated campaign finance law. Under this provision, the Commission "shall review the application and shall make the investigation if the reasons stated for the request show sufficient grounds for believing that a violation may have occurred." *Id.* NOM contends that the Commission had insufficient facts to spark an investigation against NOM. For example, NOM argues that the Commission's decision to investigate was based solely on a "bare-bones" statement from one of NOM's political enemies. (Br. of Pet. 8.) The original complaint contained no evidence that NOM had done anything other than make contributions to a PAC.

---

[9] Because the Court reaches the merits of NOM's arguments the Court does not address the Commission's arguments concerning *res judicata* or collateral estoppel.

9

The Commission contends that in August of 2009, Fred Karger, an individual from California, contacted the Commission urging it to investigate whether NOM, SMM, and other similar organizations were concealing the sources of funds contributed to SMM for the campaign. (Br. of Resp. 5); (R. 2046). On October 1, 2009, the Commission met to discuss the allegations. At the time the Commission met, SMM had reported receiving $250,000 from NOM. (R. 2064.) Based in part on Mr. Karger's statements, as well as statements from other individuals, a majority of the Commissioners (3-2) concluded that the investigation was warranted. Commissioner McKee noted that in the past, when the Commission has had to determine whether there were sufficient grounds for an investigation, most Commission members approach the question using a probable cause standard. In other words, the Commissioners ask themselves whether the information that has been provided by both sides left them with more questions than answers. Very large amounts of money were being put into the campaign in Maine and the questions regarding NOM's activities needed further investigation. (R. 2053.)

The Petitioner contends that statements made by certain Commissioners demonstrate a showing of prejudgment as the Commissioners simply wanted to make a case for regulating NOM's conduct, rather than proceeding impartially. For example, one Commissioner noted that NOM's actions were common practice in Maine. It was also noted that Maine statutes may prove insufficient to cover the activity. Yet the Commission still voted to investigate NOM.

Notwithstanding comments made by the Commissioners during deliberations, the Court finds that the Petitioner has failed to provide evidence sufficient to overcome a presumption that

the fact-finders, as state administrators, acted in good faith so as to demonstrate that the Commission was bias in its determination to investigate NOM.[10]

### ii. Selective Prosecution

Selective prosecution occurs when an agency prosecutes one group and not another. To prevail on a claim for selective enforcement or prosecution, NOM must prove that (1) it was selectively treated when compared with similarly situated entities; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or on malicious or bad faith intent to injure that person. *E. Perry Iron & Metal Co., Inc. v. City of Portland*, 2008 ME 10, ¶ 30, 941 A.2d 457 (citing *Yerardi's Moody St. Rest. & Lounge, Inc. v. Bd. of Selectmen*, 932 F.2d 89, 92 (1st Cir. 1991)). "Proving such discriminatory intent is 'an onerous burden.'" *Id.* (citing *B & B Coastal Enters. Inc. v. Demers*, 276 F.Supp.2d 155, 171 (D. Me. 2003)). Differential treatment alone is not enough to prove discriminatory intent. *Yerardi's Moody St. Rest. & Lounge, Inc.*, 932 F.2d at 92. "[U]nreasonable inferences based on conjecture or speculation" need not be accepted. *Id.* (quotation marks omitted).

NOM contends that the Commission committed selective prosecution by investigating NOM and groups supporting Question 1, but refusing to investigate groups opposing the referendum even when the Commission was presented with similar evidence regarding those

---

[10] NOM contends that the Commission's prejudice against NOM occurred even outside of the investigation. For example, in a 2012 Commission meeting, the Commission brought up "past violations" by NOM when discussing the reduction of a late-fee penalty involving a PAC formally affiliated with NOM. NOM contends that this dialogue was unwarranted as the investigation had just begun. (Br. of Pet. 9.) NOM argues that this is evidence that demonstrate at least some of the commissioners had prejudged NOM and that " the ultimate determination of the merits would move in predestined grooves." *Fox Islands*, 2014 Me. Super. LEXIS at 32-33. However, as the Commission points out, at the time the remarks about "past violations" were made, both the District Court and the First Circuit had found that NOM had received contributions governed by § 1056-B. The Court finds that the Commission did not prejudge NOM and that raising the issue of past actions was reasonable under the circumstances.

11

groups that sparked the investigation against NOM. (Br. of Pet. 9.) NOM contends that the Commission's determination had a discriminatory effect in that NOM was treated differently than other groups participating in the same election. NOM contends that this violated both the Fifth and Fourteenth Amendments. *State v. Dhuy*, 2003 ME 75, ¶ 21, 825 A.2d 336.

The Court finds that NOM's evidence is insufficient to establish selective prosecution. Its claim that the Commission did not target groups opposing the referendum is insufficient to demonstrate that the Commission's motivation for the investigation and subsequent final determination was premised on impermissible considerations. NOM failed to offer evidence on the record that the Commission failed to investigate any particular group.[11] As mentioned above, "[d]ifferential treatment alone is not enough to prove discriminatory intent. *Yerardi's Moody St. Rest. & Lounge, Inc.*, 932 F.2d at 92. The Court does not accept NOM's inferences of selective prosecution as they are based on conjecture and speculation. *Id.*

### iii. The Commission's Application of Late-Filing Penalties was Reasonable

Finally, NOM contends the fact that the Commission issued the maximum statutory penalty for late filing and refused to consider an automatic reduction, as is its normal practice, demonstrates bias and prejudice against NOM. (Br. of Pet. 12.) NOM further argues that the Commission incorrectly calculated the penalty by including the full time of the investigation. *Id.*

---

[11] On May 28, 2014, NOM requested that the Commission investigate whether Human Rights Campaign, Inc. ("HRC") was required to register and file as a BQC. NOM presented evidence of five emails from 2009 that mention the Maine referendum and four monthly newsletters that solicited donations or purchases. Consistent with the Commissions prior practices, the Commission reviewed the emails and newsletters to determine if there was probable cause to spark an investigation. The Commission determined that two emails qualified under the BQC statute. However, HRC was unable to provide the amount generated by said emails because it had switched fundraising platforms over the years. The Commission further determined that neither the State of Maine nor the Maine referendum were mentioned in the fundraising sections of the newsletters. As a result, the Commission found that there was an insufficient basis to investigate HRC.

12

The Court finds that the Commission's application of the late filing penalty to NOM was within its statutory authority and was reasonable under the circumstances. For example, the Commission explains that NOM was late in filing six separate reports and for each report the daily penalty hit the $10,000 statutory maximum before the end of 2009. (Br. of Resp. 28.) NOM also failed to timely apply for a waiver to reduce said penalties. (R. 69.) While the Commission has reduced penalties for other organizations, NOM's argument that the Commission was bias or selectively targeted NOM is without merit. The record indicates that the Commission actually cut the statutory maximum penalty by half for two of NOM's six violations. (R. 253-54); (Br. of Resp. 28.)

To succeed on a claim for bias, the bias "must be alleged with sufficient particularity to have had an effect on the fairness of the governmental proceedings." *Baker's Table, Inc. v. City of Portland*, 2000 ME 7, ¶ 9, 743 A.2d 237. In *Hale v. Petit*, the Law Court held that mere allegations of bias without specification of how a party was actually prejudiced were insufficient. 438 A.2d 226, 234 (Me. 1981). In order to show bias, the petitioner "must present evidence sufficient to overcome a presumption that the fact-finders, as state administrators acted in good faith." *Friends of Maine's Mountains v. Bd. of Envtl Prot.*, 2013 ME 25, ¶ 23, 61 A.3d 689.

Here, Petitioner's allegations of bias regarding the Commission's investigation, prosecution, determination, and penalty are not sufficient to overcome the presumption of good faith on the part of the Commission. There is no evidence in the record or presented by the Petitioner of any specific instance of partiality or prejudgment on the part of the Commission or the Commissioners. Rather, NOM simply alludes to circumstance where the Commission found differently when applying the BQC statute to other organizations. In each instance presented by NOM, the Commission conducted a reasoned review of the case at hand and made a

13

determination or decision based on the record evidence before them. This evidence presented by NOM does not demonstrate bias or compel a contrary result than that reached by the Commission.

B. Error of Law

NOM argues that the Commission considered irrelevant and impermissible factors in making their final determinations. The Court analyzes each below.

### 1. The Commission considered the involvement of individuals in both the operation of NOM and SMM as relevant to whether NOM surpassed the BQC registration threshold

NOM argues that the Commission gave weight to the fact that Brian Brown served as both the executive director of NOM as well as one of the decision makers of SMM. NOM contends that this is an erroneous reading of Maine law, as the definition of "contribution" does not contemplate such factors. (Br. of Pet. 13.) The Commission argues that Brian Brown's dual role is relevant notwithstanding the fact that nothing in Maine's campaign finance law prohibits an executive from wearing both hats during a campaign. (Br. of Pet. 13.) The Commission contends Mr. Brown's involvement in both organizations is relevant because he was on both sides of the subject transactions. Brown could designate donated funds for the purpose of the Maine campaign without having to put anything in writing.

While the statute is silent on this issue, the First Circuit noted that: "in evaluating any such donations, it is also significant that the relationship between NOM and SMM was extremely close during the 2009 campaign . . . . Such objective information, along with the timing of the contributions relative to the election, should inform 'the context of the contribution.'" *Nat'l Org.*

14

*for Marriage v. McKee*, 669 F.3d at 49. Thus, it was not error of law for the Commission to consider the relationship of the actors involved in this case.[12]

2. *The Commission concluded that funds received on the same date that NOM made a contribution to a PAC were contributions under Maine law because NOM made a contribution in the same amount*

NOM contends that the Commission should not have considered the date that funds were transferred from NOM to SMM as NOM was allowed to give donations to SMM. NOM argues that such a consideration is outside of the scope of Maine's BQC law and to consider such would cause confusion as to whether the act of making a contribution to a PAC will trigger BQC registration.

The Commission contends that NOM received unreported contributions from major donors that would have triggered the BQC reporting requirement. However, because the conversations with the major donors were made by telephone, and there is no record of the substance of the calls, the Commission relied on circumstantial evidence that the conversations referred to the Maine referendum. First, the Commission took notice of "thank-you" letters from NOM's fundraising personnel to donors, which referred to the conversation with the donor and made mention of the referendum campaign. Second, the Commission took notice that on multiple occasions, the same day that a major donor submitted funds to NOM, the same amount was transferred to SMM to support the Maine campaign. Thus, it was not error of law for the Commission5 to analyze the timing of contributions to SMM.

---

[12] NOM also argues that it was error of law for the Commission to consider NOM's overall contribution to SMM. The Court finds that the overall amount of NOM's contributions is relevant as it provides important "context" as contemplated by the federal courts.

15

### 3. *Impermissible Subjective Factors*

NOM contends that the Commission's analysis did not rely on the actual words used in the solicitations or on NOM's own conduct or communication. Instead, the Commission inquired into what the parties understood. Therefore, the Commission used an impermissible subjective standard.

For example, NOM argues that the Commission was presented with sworn testimony from Brian Brown that NOM did not covey to major donors that donations would be used in Maine. Rather, donors were told they should give to SMM if they wanted to support the effort in Maine. (Br. of Pet 17);(R. 22-27.) Thus, NOM could not predict that donations from Major donors would be considered for the purpose of influencing a Maine ballot question. In other words, contrary to the Commission's findings, the fact that a particular donor may have known subjectively that NOM made contributions to SMM, the donation cannot be considered a contribution.[13]

The Commission contends that in reviewing NOM's correspondence with its supporters, it applied the objective test as applied by the First Circuit. As such the Commission analyzed what a reasonable contributor would conclude from NOM's communications. The Court finds that this application is consistent with the federal courts and is based on permissible objective factors that inform the context of the contribution.

---

[13] For example, Donor # 2 received a "thank-you" note from Brian Brown highlighting NOM's planned activities in support of the Maine referendum. The letter also notes "as you know from your discussions with [NOM fundraising consultant] Steve Linder, NOM has already contributed over $250,000.00 in the effort to protect marriage in Maine." (R. 23.) While the Commission was not privy to the substance of the actual phone call soliciting the funds, the Commission gave weight to the fact that the check for $50,000 was deposited in NOM's bank account on the same day was transferred to SMM.

16

*d. The Commission found that all donations received in response to NOM communications that mentioned a Maine ballot question are "contributions" under 21-A M.R.S. § 1056-B(2-A)*

NOM contends that only a pro-rated portion of donations received in response to NOM's multi-jurisdictional communications should have been included as "contributions." By accepting all donations as contributions, the Commission employed a broad application of the BQC statute that was not contemplated by the Legislature. Such an expansive application of the statute was not before the federal courts when they upheld the BQC statute in prior as applied challenges.[14]

NOM argues that at the very least, any funds received in response to said communications should have been pro-rated by the Commission so that the amount considered "contributions" under Maine law matched the proportion of the communication discussing a Maine ballot question. Failure to do so results in the statute being unconstitutionally overbroad. NOM contends that the plain meaning of the statute regulates only funds received for the purpose of influencing a specific ballot question.[15]

---

[14] NOM cites *Emily's List v. Fed. Election Comm'n*, for this assertion. 581 F.3d 1, 18 (D.C. Cir. 2009). However, the Court finds *Emily's List* distinguishable. In that case, the Federal Election Commission limited the amount non-profits could raise and spend in support of a campaign. As a result, certain non-profits were required to pay a large percentage of election-related activities out of their "hard-money" accounts. *Id.* at 4. However, unlike *Emily's List*, the Maine statute is closely drawn to serve a cognizable interest of campaign finance transparency by requiring that entities register and report contribution over $5,000. The Maine statute in no way limits a non-profits ability to solicit funds or communicate with the public.

[15] Both the District Court and the First Circuit refused to accept NOM's argument that the absence of an express statement earmarking funds overcomes the BQC reporting requirements. The District Court found that: "[p]resumably the statute's drafters were concerned that those who solicit contributions might find devious ways to avoid coverage by keeping the language of both the solicitation and the donation clean of any suggestion of earmarking, even though everyone knew what was going on. *Nat'l Org. for Marriage v. McKee*, 765 F. Supp. 2d 38, 51 (D. Me. 2011) *aff'd sub nom. Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d 34 (1st Cir. 2012). The First Circuit noted that requiring express earmarking "would allow entities to easily evade disclosure requirements by guiding the content of donors' messages, defeating the State's compelling interest in informing voters." 669 F.3d 47 n. 13. Thus, in accordance with the federal court decisions, the Court finds that the Commission did not err as a matter of law or abuse its discretion in refusing to require express earmarking of funds before applying the BQC statute.

The Court refuses to entertain this argument. The District concluded that the statute "makes no mention of pro rating" and "the Commission has not by regulation or form, created a pro rating regime." *Nat'l Org. For Marriage v. McKee*, 666 F. Supp. 2d 193, 212 (D. Me. 2009). Rather, the District Court found that:

> The clear language of the statute requires reporting the entire amount, even though some of that contribution might ultimately be devoted to other states. The language is neither vague or substantially overbroad. One might argue that including the entire amount given in response to a multi-purpose solicitation is excessive, but that approach might also be defended as a legitimate tool to corral those who seek to escape the statute by clever wording in their solicitations.

*Id.* Thus, in accordance with the federal courts, the Court does not find Petitioner's argument concerning pro-ration of multi-purpose and multi-jurisdictional correspondence persuasive. Aside from arguing that the failure to pro-rate results in the statute being overbroad as applied to the petitioner, which was expressly rejected by the District Court and by the First Circuit,[16] the Petitioner has failed to identify any constitutional defect in considering the entire amount of such contribution as attributable to Maine.

D. The Commission's Determination is Supported by Substantial Evidence on the Record

The Court finds that the Petitioner has failed to meet its burden of establishing that no competent evidence supports the Commission's decision or that the record compels a contrary conclusion. *Bischoff v. Maine State Ret. Sys.*, 661 A.2d 167, 170 (Me. 1995). The

---

[16] Judge Lipez noted:

> Unsurprisingly, appellants offer no support for the contention that the State may regulate only explicitly earmarked funds. Such a limitation would allow entities to easily evade disclosure requirements by guiding the content of donors' messages, defeating the State's compelling interest in informing voters. We reject any such argument out of hand.

*Nat'l Org. for Marriage, Inc. v. McKee*, 669 F.3d at 49 (internal citations omitted).

18

Commission's determination was based on substantial evidence in the record and was not clouded by bias or error of law.

## V. CONCLUSION

Based on the foregoing, Petitioner's Appeal pursuant to M.R. Civ. P. 80C is DENIED.

This Order may be noted on the docket by reference pursuant to Rule 79(a) of the Maine Rules of Civil Procedure.

4/10/15

DATE

M. MICHAELA MURPHY, JUSTICE
BUSINESS AND CONSUMER COURT

Entered on the Docket: 4/13/15
Copies sent via Mail___ Electronically ✓

19

**The National Organization for Marriage v.
Maine Commission on Governmental Ethical
and Election Practices**

**BCD-AP-2014-02**

**The National Organization for Marriage**
    **Plaintiff**

        Counsel:               Stephen Whiting, Esq.
                              75 Pearl Street, Suite 207
                              Portland, ME 04101

**Maine Commission on Governmental Ethical
and Election Practices**

    **Defendant**

        Counsel:               Phyllis Gardner, AAG
                              6 State House Station
                              Augusta, ME 04333